AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
9/3/25
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MRV _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

09/03/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ jm ___ DEPUTY

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>Ilie Cauni,<br><br>Defendant | Case No.  2:25-mj-05452-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of September 3, 2025 in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(2) | Use of Unauthorized Access Devices |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/*
*Complainant's signature*

Teresa Healy, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   9/3/2025 at 4:17 pm

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Michael Kaufman, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kali M. Yallourakis (x2426)

## AFFIDAVIT

I, TERESA HEALY, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against Ilie CAUNI("CAUNI") for a violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access devices).

2.   This affidavit is also made in support of an application for a warrant to search a black Samsung (IMEI number 359914420550013) seized from CAUNI on September 2, 2025 (the "SUBJECT DEVICE") and currently in the custody of Homeland Security Investigations ("HSI"), in Paramount, CA, and described in Attachment A.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1028A (Aggravated Identity Theft), 1029 (Access Device Fraud), and 1344 (Bank Fraud) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent with the United States Secret Service ("USSS") and have been so employed since April 2016. I am currently assigned to the HSI El Camino Real Financial Crimes Taskforce in Los Angeles, CA.

6.    In becoming a Special Agent, I have completed criminal investigative training, including the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, and the USSS Special Agent Training Course at the James J. Rowley Training Center in Beltsville, Maryland. I have attended multiple advanced and in-service trainings regarding the investigation of cyber-enabled financial crimes, including the Basic Investigation of Computer and Electronic Crimes, Network Intrusion Triage and Response, and training regarding money laundering and asset forfeiture.

7.    During my tenure as a Special Agent with USSS, I have investigated and arrested numerous individuals for federal felony offenses including wire fraud, bank fraud, identity theft, money laundering, and access device fraud, among other offenses. During these investigations, I have personally obtained or participated in the execution of several search and seizure warrants.

## III. SUMMARY OF PROBABLE CAUSE

8.    Between January 2024 and January 1, 2025, the California Department of Social Services ("DSS") detected more

than $126.8 million in stolen funds from victim Electronic Benefit Transfer ("EBT") cards. This fraud is from two specific programs known as CalFresh and CalWORKS, which help low-income households pay for housing, food, and other necessary expenses. Many of the fraudulent withdrawals are done at specific ATMs in the Central District of California.

9.    On or about September 2, 2025, beginning at approximately 5:30 a.m., law enforcement began physical surveillance at the U.S. Bank, Fairfax branch, located at 145 S Fairfax Ave, Los Angeles, CA 90036 ("Target Bank"), which was identified by DSS as one of the top ATM locations for EBT fraud.

10.    At approximately 6:00 a.m., law enforcement saw CAUNI arrive at an ATM terminal located at the Target Bank where law enforcement was conducting surveillance. CAUNI withdrew approximately $1,660 in cash from the ATM using one access device.  CAUNI was then detained and found with approximately 20 access devices in his possession. These access devices were later determined to be cloned California EBT cards, one of which was a card number ending in 6674, the same EBT card information CAUNI used to withdraw $1,660 in cash from the ATM. CAUNI was arrested and found possessing approximately $1,660 in cash and the SUBJECT DEVICE.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

11.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. Regulatory Background of CalFresh and CalWORKs Programs

12. DSS is a government agency that administers several benefit and assistance programs for residents of the state of California. One of the assistance programs administered by DSS is called CalFresh (formerly known as food stamps), which helps low-income households purchase food and household items to meet their nutritional needs. Another assistance program administered by DSS is called CalWORKs, which helps low-income families with children pay for housing, food, and other necessary expenses.

13. Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply online for benefits at www.getcalfresh.org and www.benefitscal.com. Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

14. CalFresh and CalWORKs benefits are issued through Electronic Benefit Transfer cards ("EBT cards"). EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions. For example, you can use an EBT card to make a purchase at a grocery or convenience store by swiping the card at a point-of-sale terminal.

15. The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN"). A BIN refers to the first five or six digits of the account number on a debit or credit card and can be used to identify the issuer of

the card, like DSS, which administers the CalFresh and CalWORKs programs.

16. Benefits received through the program are typically disbursed to EBT cardholders by DSS during the early days of each month. Those benefits are deposited directly from DSS into the account of the EBT cardholder.

17. The EBT cardholders can then conduct cash withdrawals at ATMs using a personal identification number ("PIN") established by the card holder. The EBT cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the funds previously deposited by DSS intended for beneficiaries of the CalFresh or CalWORKs programs.

**B.    Background on EBT Fraud in the Los Angeles Area and Prior State and Federal Operations**

18. Since in or about August 2022, local law enforcement has been working with DSS to investigate a significant increase in unauthorized cash withdrawals utilizing EBT cards. Based on analysis of victim complaints to DSS, victim complaints to local law enforcement, bank records, and surveillance, law enforcement determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

19. A cloned card can be a blank white plastic card or another debit, credit, or gift card that contains altered information on the card's magnetic stripe. Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's

magnetic stripe.  Cloning these cards allows the suspect to use the card and the DSS benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

20.  On a legitimate debit or credit card, the information contained on the card's magnetic stripe will match the information embossed on the front of the card. This information includes the account number, expiration date, and cardholder's name, among other information. Whereas on a cloned card, the information contained on the magnetic stripe will not match the information embossed on the front of the card. For example, if a suspect re-encodes victim EBT card information onto a pre-existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be encoded with the EBT card information, but the card itself will still bear the embossed information of the gift card or bear no information if it is a blank white plastic card.

21.  Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

22.  The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholder's debit and credit card numbers and PIN at, for example, ATMs or point-of-sale terminals. For example, individuals conducting ATM "skimming" may install a skimming device into the card reader of the ATM to record the debit or

credit card numbers, as well as a camera or keypad overlay on
the ATM keypad to record the associated PIN number. Those
individuals will then return to the ATM to collect the card
number and PIN information stored on the installed device.

23.  As described above, suspects then manufacture cloned
and fraudulent debit or credit cards that bear the victim
account holder's account information that was obtained from
skimming. Once that information is loaded onto another
fraudulent card (e.g., a gift card or blank plastic card),
members of the scheme then use that fraudulent card to withdraw
cash from the victim accountholder's bank accounts or to make
purchases with the victim accountholder's account.

24.  In or about September 2022, local law enforcement
conducted a surveillance and arrest operation in the Los
Angeles, California area. This operation was planned in response
to the large number of unauthorized withdrawals occurring at
ATMs in the Los Angeles area during a short period of time.
Specifically, law enforcement had analyzed fraudulent EBT
withdrawal data and noticed a high volume of unauthorized
withdrawals on specific dates and times that coincided with the
dates when the majority of benefits are disbursed to EBT
cardholders.

25.  As a result of this operation, local law enforcement
established surveillance at select ATMs that were used to
conduct a significant volume of EBT fraud. Law enforcement
surveilled those ATMs around the dates when benefits had been
disbursed, observed suspects that withdrew a high volume of

unauthorized withdrawals and that conducted those withdrawals in rapid succession, and arrested multiple individuals believed to be making fraudulent withdrawals of EBT benefits. As a result, law enforcement arrested approximately 16 suspects. All of the arrested suspects were later determined to be citizens of countries other than the United States who did not have documentation to be lawfully present in the United States. All of the individuals arrested were released from local custody within hours of their arrest and absconded from any future judicial proceedings.

26.   In or about February 2023, in response to a further increase in unauthorized cash withdrawals utilizing EBT cards after the local law enforcement September 2022 operation, federal law enforcement conducted a similar surveillance and arrest operation in the Los Angeles, California area. Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs. Law enforcement arrested three suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession.  Two of those defendants came to the ATM together, possessed 35 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that they had made more than $190,000 in past attempted fraudulent EBT withdrawals from a single bank since October 2022.  One additional defendant possessed 269 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that the defendant had made more than

$70,000 in past attempted fraudulent EBT withdrawals from a single bank since January 2023. All three of these defendants were determined to be citizens of Romania, who did not have documentation to be lawfully present in the United States. The three arrested defendants were ordered detained pending trial by the Hon. Karen Stevenson and Hon. Margo A. Rocconi. A federal grand jury returned two indictments against the three defendants for bank fraud, in violation of 18 U.S.C. § 1344; aggravated identity theft, in violation of 18 U.S.C. § 1028A; use of unauthorized access devices, in violation 18 U.S.C. § 1029(a)(2); and possession of unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), in 23-CR-0076-FLA and 23-CR-0077-JFW.

27.  In or about March 2023, federal law enforcement conducted another surveillance and arrest operation in the Los Angeles, California area. Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs. Law enforcement arrested eleven suspects that conducted a high volume of unauthorized transactions and that conducted those transactions in rapid succession. At the time of their arrest, the suspects had in their possession over 400 cloned cards, $120,000 in illicitly obtained funds, and multiple skimming devices.

28.  Ten out of the eleven of these defendants were determined to be citizens of Romania, who did not have documentation to be lawfully present in the United States.

**C.    Background of Current Operation to Combat EBT Fraud**

29.    The most current data provided by DSS, based in part upon reported fraud by victims, indicates that between January 2024 and January 1, 2025, more than approximately $126.8 million in cash benefits has been stolen from victim EBT cards throughout California.

30.    Of the more than approximately $126.8 million in cash benefits stolen during this year time period, more than approximately $57.9 million has been stolen from victim EBT cards, in the county of Los Angeles alone. The majority of these funds were stolen through unauthorized ATM withdrawals.

31.    Between on or about December 1, 2024, and on or about December 31, 2024, according to data from DSS, more than approximately $11.4 million was stolen from victim EBT cards largely through unauthorized ATM withdrawals.  Of the approximately $11.4 million stolen from victim EBT cards in the month of December 2024, more than approximately $6.2 million was stolen, mostly through unauthorized ATM withdrawals, in Los Angeles County alone.

32.    Based upon my training and experience conducting access device fraud investigations, I know that suspects committing access device fraud schemes will often target particular BINs when harvesting stolen card information collected from skimming devices. Thus, suspects using skimming devices may target the BIN associated with DSS, in essence, targeting CalFresh and CalWORKs benefits. Moreover, based upon my training and experience, the sheer volume of unauthorized ATM

withdrawals occurring during the early days of the month is further indicative that suspects participating in the fraud scheme at issue are targeting EBT cards because benefits are typically disbursed to EBT cardholders during the early days of each month.

33. Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue. During the unauthorized ATM withdrawals, suspects can often be seen holding stacks of cards and conducting withdrawals in quick succession at one ATM. Based upon my training and experience, I know that suspects perpetrating access device fraud schemes will often conduct unauthorized withdrawals using cloned cards in rapid succession at ATMs.

34. Based upon the rapid succession of unauthorized ATM withdrawals being conducted, the fact that the cards being used to conduct the unauthorized cash withdrawals are nearly all cloned EBT cards, and the fact that nearly all of the unauthorized withdrawals are happening during the early days of the month, I believe that suspects participating in the fraud scheme at issue are ostensibly targeting EBT cards.

**D.  Historical EBT fraud committed by CAUNI on August 1-3, 2025**

35. Based on information received from DSS and the Target Bank, CAUNI was observed at a U.S. Bank in Santa Monica, California on August 1, 2025, a U.S. Bank in Century City, California on August 2, 2025, and the Target Bank on August 3,

2025. Between those three days, CAUNI withdrew approximately over $40,000 utilizing approximately 32 California EBT cards.

**E.  CAUNI Committed EBT Fraud Using an Unauthorized Access Device on September 2, 2025**

36.  Based upon the large dollar amount being stolen from victim EBT cards, the number of victims impacted, the concentration of unauthorized ATM withdrawals occurring in particular areas, and the large number of unauthorized ATM withdrawals occurring at singular bank locations, law enforcement decided to conduct a surveillance and arrest operation in September 2025.

37.  Based upon my training and experience, I know that as an anti-fraud measure, Cal DSS places an embargo on EBT accounts, such that EBT cardholders are not able to conduct cash withdrawals from their EBT cards from approximately 12:00 a.m. to 6:00 a.m., on the morning that their funds load (i.e., the 1st, 2nd, or 3rd of the month, depending on the account).

38.  On or about September 2, 2025, beginning at approximately 5:30 a.m., law enforcement began surveillance on the Target Bank.

39.  At approximately 6:00 a.m., based on my physical observation and my review of surveillance footage, CAUNI walked up to the Target Bank ATM terminal. Law enforcement observed CAUNI cover the ATM camera with tape. CAUNI then appeared to conduct a transaction after which he repeatedly looked around and over his shoulder.

40.   Based on the date, time, ATM location, a real-time
alert law enforcement received that an EBT card number was being
used on September 2, and CAUNI withdrawing from ATMs using
California EBT cards from August 1-3, 2025, law enforcement
determined there was probable cause and detained CAUNI in order
to investigate further.

41.   Law enforcement recovered the following from CAUNI's
person: approximately $1,660 (in his right pants pocket); the
SUBJECT DEVICE (right front top jacket pocket); 11 red or blue
blank plastic access devices (left inside suit pocket); 9 red or
blue blank plastic access devices; and a U.S. Bank ATM receipt
showing a withdrawal of $1,660 from a card number ending in 6674
(within a wallet in the right inside suit pocket). The access
devices, like the one pictured below, had stickers placed on
them with what appeared to be, based on my training and
experience, card balances and victim PINs.



42.   I analyzed the magnetic stripes of the 20 access
devices in CAUNI's possession and determined that all the red or
blue access devices were encoded with California EBT BINs.

43.    Based on my review of ATM surveillance stills depicting the Target Bank, I saw CAUNI approach the Target Bank ATM camera and cover the camera with tape. Based on my review of logs provided by U.S. Bank, during the time when CAUNI was at the ATM, there was one withdrawal involving an EBT card number – which matched the 6674 EBT card number encoded on the cloned card seized from CAUNI incident to his arrest. That one transaction totaled $1,660 in financial loss.

44.    Based on my review of EBT cardholder information obtained from California DSS, none of the EBT cards in CAUNI's possession belonged to him. Specifically, while CAUNI was at the Target Bank ATM, law enforcement learned that CAUNI made the withdrawal belonging to the EBT card number ending in 6674 belonging to victim M.I. Law enforcement similarly confirmed with California's Department of Motor Vehicles ("DMV") that CAUNI, a male, did not match the victim M.I., who is a female.

45.    Law enforcement searched for CAUNI in U.S. Immigration and Customs Enforcement databases and learned he had no lawful status in the United States. CAUNI had also previously been arrested in 2012 by New York City Police Department for possession of a forged instrument, in 2013 by ICE ERO for alien inadmissibility, and in 2018 by the Los Angeles Police Department for petty theft.

46.    The SUBJECT DEVICE was retrieved from CAUNI's right front top jacket pocket. The SUBJECT DEVICE was secured and transported to HSI's Paramount office where the device is securely held pending issuance of a search warrant.

## V.  TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES

47.  Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a.  It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.  Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items retrieved from stolen mail or mail matter, with their cellphones.

c.    It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.  Identity thieves often keep such information in their cars, storage units, and in their digital devices.

d.    It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.  These types of devices are routinely kept where the person will have easy access to such devices, such as on their person or in their cars or homes or storage units.  Software relevant to such schemes can also often be found on digital devices, such as computers.

e.    Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their

digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

### VI.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES

48.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

49.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are

not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    50.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

       a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a

complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

51.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after

a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

       c.   The person who is in possession of a device or
has the device among his or her belongings is likely a user of
the device.  Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress CAUNI's thumb and/or fingers on the
device; and (2) hold the device in front of CAUNI's face with
his eyes open to activate the facial-, iris-, and/or retina-
recognition feature.

   52.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VII.  **CONCLUSION**

   53.  For all of the reasons described above, there is
probable cause to believe that CAUNI committed a violation of 18
U.S.C. § 1029(a)(2) (use of unauthorized access devices).  There
is also probable cause that the items to be seized described in
Attachment B will be found in a search of the SUBJECT DEVICE as
described in Attachment A.

Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone on
this 3rd day of September, 2025.

_____
THE HONORABLE MICHAEL KAUFMAN
UNITED STATES MAGISTRATE JUDGE